UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs.<br><br>v.<br><br>MARY CAROL S. JOHNSON; JAMES W. SMITH; MARIAN S. BARNWELL; BILLIE ANN S. DEVINE; and EVE H. SMITH<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:11-cv-00087<br><br>Judge Clark Waddoups |

This is a tax case filed by the United States to collect unpaid federal estate taxes owed by the Estate of Hazel Anna S. Smith ("Estate"). This matter is before the court on the plaintiff's Second Motion for Summary Judgment (Dkt. No. 117), defendants' Motion for Reconsideration of the court's prior order granting partial summary judgment in favor of the government (Dkt. No. 119), and defendants' Motion for Summary Judgment (Dkt. No. 122).

## FACTUAL BACKGROUND

The defendants in this action include the four children of Anna S. Smith (the "Decedent"), namely Mary Carol S. Johnson, James W. Smith, Marian S. Barnwell, and Billie Ann S. Devine. During the course of this litigation, Marian S. Barnwell and Billie Ann S. Devine passed away, and their estates have not been substituted as defendants. Eve H. Smith, who was named as a fifth defendant, is the wife of James W. Smith. In its prior order in this case, the court dismissed Mrs. Smith as a party to the litigation. (Am. Mem. Decision and Order, Dkt. No. 75.)

During her lifetime, Decedent and two of her children, defendants Mary Carol S. Johnson ("Johnson") and James W. Smith ("Smith"), executed a trust agreement dated February 8, 1982 for the creation of The Anna Smith Family Trust (the "Trust"), in which Decedent, Johnson and Smith were named as co-trustees. The Trust was funded on February 9, 1982 by 11,466 shares of stock in State Line Hotel, Inc. ("Hotel"). The Hotel was the holder of a Nevada gaming license. Nearly one year later, on February 1, 1990, Decedent, Johnson and Smith executed an amended trust agreement, which removed Smith and Johnson as co-trustees and left Decedent as the sole trustee of Trust.

On May 1, 1990, Decedent executed the Second Amended Trust Agreement ("Trust Agreement") as both grantor and sole trustee, which was the agreement in effect at the time of Decedent's death on September 2, 1991. It is undisputed that the Decedent had an unlimited power to modify, alter, amend, revoke, or terminate the trust at any time during her life. It is also undisputed that the Decedent, as grantor, had the right to withdraw principal and income from the Trust as she directed during her lifetime, and that no Trust beneficiaries had an enforceable right to any distributions from the Trust during Decedent's life. The Trust Agreement named Johnson and Smith as successor trustees. Johnson and Smith were also named in the Decedent's will as personal representatives of Decedent's Estate. Neither Decedent's Estate nor the Trust have been named as defendants in this lawsuit.

Upon Decedent's death, her will directed the personal representatives to ensure that the Decedent's "debts, last illness, and funeral and burial expenses be paid as soon after [her] death as reasonably convenient." (Will ¶ II; Dkt. No. 32, Ex. A.)  It further directed the personal representatives that "claims against [the] estate" may be settled and discharged in the "absolute discretion of [the] Personal Representatives," although it did not expressly direct the personal

representatives to pay any federal estate tax levied against the Estate. (*Id.*) The "rest and residue" of the Estate was to be delivered to the successor trustees and added by them to the principal of the Trust to be administered as directed by the trustees. (*Id.* at ¶ IV.)

The Trust Agreement provided for the successor trustees to make specific distributions, as soon as possible after the Decedent's death, from the principal of the Trust to individuals who are not parties to this suit. (Trust Agreement, 2; Dkt. No. 32, Ex. B.) The successor trustees were then directed to

> pay any and all debts and obligations of the GRANTOR, the last illness, funeral, and burial expenses of the GRANTOR and any State and Federal income, inheritance and *estate taxes* which may then be owing or which may become due and owing as a result of the GRANTOR's death.

(*Id.*) (Emphasis added.) After these expenses were paid by the successor trustees, one third of the remaining Trust corpus (not to exceed $1,000,000) was to be divided into four equal parts to be distributed to one of the four family limited partnerships that had been established for each of the heirs. (*Id.* at 4.) Finally, the remaining principal and undistributed income of the Trust was to be distributed equally between the heirs by the successor trustees. (*Id.* at 4-5.) The heirs also received benefits valued at $369,878 from several life insurance policies belonging to the Decedent. (Dkt. No. 86-3, p. 8.)

As directed by the Trust Agreement, the successor trustees filed a federal estate tax return with the Internal Revenue Service ("IRS") on June 1, 1992. The Decedent's gross estate was valued on the return at $15,958,765, resulting in a federal estate tax liability of $6,631,448, of which $4,000,000 was paid at the time of filing. (*See* United States Estate Tax Return, Dkt. No. 86-3.) The majority of the Decedent's gross estate consisted of 9,994 shares of stock in the Hotel, valued by a valuation expert on the return at $11,508,400. Because the Hotel was a closely held business and its value constituted more than thirty-five percent of the Decedent's adjusted

gross estate, the successor trustees validly elected to defer payment of the remainder of the

federal estate tax liability pursuant to 26 U.S.C. § 6166(a). Consistent with Section 6166, the

election provided that the remaining balance of the tax liability would be deferred for five years,

at which time the successor trustees would pay it in ten annual installments beginning on June 2,

1997 and ending on June 2, 2006. (*See* Election, Dkt. No. 32-5.)  After receiving the estate tax

return, the IRS properly assessed the Estate for unpaid estate taxes on July 13, 1992.

It is undisputed that Nevada gambling law limited the ability of a Trust to own stock in a

casino. The Trust and the successor trustees had received special permission for ownership in the

Hotel that was set to expire in January 1993. (Ltr. from Nevada Gaming Ctrl. Bd. dated July 23,

1992; Dkt. No. 139, p. 220.) The parties do not dispute that because the application process to

gain permanent approval for such ownership was extensive, expensive, and ultimately uncertain,

the successor trustees decided to distribute the Hotel stock from the Trust to the beneficiaries.

Accordingly, on December 31, 1992, the successor trustees and the heirs executed an agreement

(the "Distribution Agreement") distributing the remaining Trust assets to the heirs. (*See*

Agreement; Dkt. No. 32, Ex. G.)  The Distribution Agreement indicated the following regarding

the outstanding estate tax liability:

> 6. Liability for Taxes. Each of the BENEFICIARIES acknowledges that the assets
> distributed to him or her will accomplish a complete distribution of the assets of
> the Trust. A portion of the total federal estate tax upon the Estate of Anna Smith
> is being deferred and is the equal obligation of the BENEFICIARIES to pay as the
> same becomes due. Likewise, if, upon audit, additional federal estate taxes or
> Utah inheritance taxes are found to be owing, the responsibility for any such
> additional taxes, interest or penalties will be borne equally by the
> BENEFICIARIES.

(*Id.*)  On December 28, 1992, a few days prior to signing this agreement, the Estate paid the IRS

an additional $1,000,000 on the deferred tax owed. Defendants assert, and the government has

provided no contrary evidence, that at the time the Distribution Agreement was signed, their

combined net worth was approximately $21.1 million, whereas the estate tax liability at that time was approximately $1.46 million. From the date the Distribution Agreement was signed until 2001, it is undisputed that additional payments on the deferred tax totaling $1,399,221.87 were made to the IRS by the Hotel on behalf of the defendants, who held the majority of the ownership of the Hotel from 1992 to 2001.

On May 30, 1995, approximately two years prior to the start date of the Section 6166(a) deferred tax installment payments, the IRS issued a Notice of Deficiency against the Estate. The IRS claimed that the 9,994 shares of Hotel stock were worth $15,500,000 rather than $11,508,400 at the time of Decedent's death. (*See* Notice of Deficiency; Dkt. No. 32, Ex. E.) According to the IRS, this adjusted valuation resulted in an alleged additional estate tax of $2,444,367. The Estate contested the Notice of Deficiency, and a settlement was ultimately reached where the Estate agreed to pay additional federal estate taxes in the amount of $240,381. The IRS assessed the Estate for the second time pursuant to that settlement on December 30, 1996.

On May 27, 1997, about a week prior to the due date of the first estate tax installment payment, Colleen Girard, an agent from the IRS, sent a letter to Johnson in her capacity as executor of the Estate, informing her "of an alternative to your continued personal liability for the unpaid estate tax . . . deferred under 26 U.S.C. Section 6166." One of the alternatives offered was for Johnson "to furnish a Special Lien for Estate Tax Deferred Under Section 6166, as described in 26 U.S.C. Section 6324A." (Ltr. from Colleen Girard dated May 27, 1997; Dkt. No. 122-2, pp. 3-4.)  Accordingly, on August 4, 1997, after obtaining additional information from the IRS about the information required to submit the Section 6324A special lien, Johnson and Smith, through counsel, provided the IRS with an executed Agreement to Special Lien Under Section

6324A signed by all four children of the Decedent, an agreement restricting the sale of the Hotel stock while the lien on the stock was in effect, and the additional information about the Hotel stock requested by the IRS. (Ltr. from David Salisbury dated Aug. 4, 1997; Dkt. No. 122-2, p. 7.) It is undisputed that at no point during this exchange of information did Ms. Girard mention or attach a "notice of election" or other application form required to furnish the IRS with a special lien.

Although unknown to the defendants at the time, Ms. Girard then sought guidance from IRS District Counsel regarding the use of stock in a closely held corporation as security for a special lien under Section 6324A. (Aug. 21, 1997 IRS Memo.; Dkt. No. 122-2, p. 13.)  Ms. Girard informed District Counsel that the Estate had consented to the lien and offered 4,768 shares of stock which, based on the 1996 Tax Court settlement, had a value of $1,273 per share, or a total value of $6,092,578. Given that the unpaid balance of the tax assessment was $1,899,970 and the amount of security needed was $2,192,365.20, Ms. Girard stated that "I have analyzed the security and feel a lien under IRC 6324A against the stock will adequately secure the liability for the remainder of the IRC 6166 election." (*Id.*)

Notwithstanding the foregoing, in a letter dated November 6, 1997, Ms. Girard subsequently notified Smith and Johnson that District Counsel had "advised our office that closely held stock should not be accepted as collateral by the Internal Revenue Service because the IRS cannot sell stock at a public auction as it violates securities regulations." (Ltr. from Colleen Girard dated Nov. 6, 1997; Dkt. No. 122-2, p. 15.)  Through counsel, Smith and Johnson responded that if there were securities law problems with the stock held by the IRS in its Section 6324A Special Lien, "it would appear that they belong to the IRS, not to the taxpayer," and that it was their position that "if an election is made under Section 6324A and the identified property

can be expected to survive the period of deferral, the requirements of the statute have been met and the application of the special lien is mandatory." (Ltr. from David Salisbury dated Jan. 13, 1998; Dkt. No. 122-2, pp. 17-18.)  In any event, Ms. Girard, Smith, and Johnson all agreed to wait two years to revisit the matter in 2000. (Ltr. from Ms. Girard dated Jan. 20, 1998; Dkt. No. 122-2, pp. 19-20.) It is undisputed that neither Ms. Girard, nor anyone else at the IRS, ever contacted Smith, Johnson, or their attorneys again with respect to the Section 6324A special lien.

In January 2002, the Hotel filed for Chapter 11 bankruptcy in the state of Nevada. It is undisputed that as a result of the bankruptcy proceedings, the beneficiaries were instructed to stop making any more distributions to pay the estate tax. The defendants did apply for an extension of time to pay the next installment due under Section 6166 and notified the IRS that the Hotel was in bankruptcy proceedings. (Dkt. No. 139, pp. 164-166.)  By May 2002, the bankruptcy court approved the sale of all Hotel assets free of liens, claims, and encumbrances. As shareholders, the heirs received no value for their Hotel ownership interests in the bankruptcy.

Over a year after the conclusion of the Hotel bankruptcy, the IRS sent Smith and Johnson delinquent billing notices for the outstanding estate taxes dated August 28 and December 2, 2003. The latter notice stated that if the payment due was not received by the IRS by December 15, 2003, the "installment agreement will be in danger of defaulting. If this occurs, the whole balance due on the account will be due immediately and turned over for collection." (2nd Delinquent Installment Billing-2003, Dkt. No. 139, p. 163.)  The installment payment was not made in 2003. In 2005, the Estate, through counsel, communicated with Byron Broda at the IRS about the inability of the Estate to pay its outstanding estate taxes. Counsel sent Mr. Broda an explanation of the Estate's distribution of assets in 1992, the financial difficulties of the Hotel

and the bankruptcy, as well as a copy of the Distribution Agreement. (Dkt. No. 139, pp. 168-183.)  The parties agree that the IRS then sent Smith and Johnson notices of their intent to levy unspecified assets in approximately July 2005. (Gov. Opp. Mem. to Second Mot. Summ. J.; Dkt. No. 138, p. 14.)  On July 8, 2005, the IRS sent the Estate a Notice of Federal Tax Lien, and indicated it had been filed with the County Recorder of Salt Lake and Tooele counties in Utah. The notice included a statement that said:

> **IMPORTANT RELEASE INFORMATION:**  For each assessment listed below, unless notice of the lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

The last refiling date listed in column (e) of this notice listed "N/A" with respect to the 1992 estate tax assessment, and January 29, 2007 with respect to the 1996 estate tax assessment. (2005 Notice of Federal Tax Lien; Dkt. No. 139, pp. 197-199.)  The assessment was for a total of $1,569,9671.67 which appeared to be attributable in full to the 1996 tax assessment. (*Id.*)

On or about September 12, 2005, the IRS sent a Notice of Levy to each of the individual defendant children, Smith, Johnson, Bille Ann S. Devine, and Marian S. Barnwell. The notices stated, "This levy attaches assets includible in the gross estate of Hazel Anna S. Smith, which were distributed or transferred to you, including but not limited to cash and life insurance proceeds." (Notices of Levy; Dkt. No. 139, pp. 206-209.)  Thereafter, on November 15, 2005, Mr. Broda recommended that the government pursue a civil suit against the Estate, Johnson, and Smith for transferee liability for the estate tax. This lawsuit was not filed until January 21, 2011.

On or about January 9, 2007, the IRS sent the Estate a corrected Notice of Federal Tax Lien, which was also filed in Salt Lake and Tooele counties. This notice claimed it was "filed to correct the amount due on the original lien," but that otherwise the "information on the original notice filed is correct and that instrument remains in full force and effect." (2007 Notice of

Federal Tax Lien; Dkt. No. 139, pp. 200-202.)  This notice apportioned the tax owed between the

1992 assessment ($1,164,490.94) and the 1996 assessment ($405,220.73). (*Id.*)  The IRS did not

re-file their Notice of Federal Tax Lien by January 29, 2007, the deadline identified on the

original and corrected notices. Rather, the IRS issued Certificates of Release for both the 2005

and 2007 liens on February 18, 2007, which stated that "the lien provided by Code section 6321

for these taxes and additions has been released." (Certificate of Release of Federal Tax Lien;

Dkt. No. 139, pp. 210-213.)  These certificates were filed in both Salt Lake and Tooele counties.

(*Id.*)

Several months later on March 27, 2007, the IRS mailed the Estate a Revocation of

Certificate of Release of Federal Tax Lien with respect to both the 1992 and 1996 assessments

filed in both Salt Lake and Tooele counties, stating that "we mistakenly allowed Notices of

Federal Tax Lien filed against Hazel Anna S. Smith Estate to be released" and that the releases

"are revoked and the liens are reinstated, as provided under Internal Revenue Code, Section

6325(f)(2)." (Revocations, Dkt. No. 139, pp. 214-217.)  The IRS admits that the revocation

notice was not filed with the Salt Lake county recorder's office as required by statute. (Decl. of

Jennifer Graham ¶ 3, Dkt. No. 148.)  Similarly, the IRS admits that on October 12, 2012 it again

filed Certificates of Release of Federal Tax Lien with respect to both the 1992 and 1996

assessments in Salt Lake county. (*Id.* at ¶ 4.)  However, on May 15, 2015, the IRS finally filed its

Revocation of those releases with the Salt Lake county recorder's office, along with a new

Notice of Federal Tax Lien against the Estate, stating that the government now has until August

12, 2025 to refile its lien for the 1992 assessment and until December 30, 2025 to refile its lien

for the 1996 assessment. (*Id.* at Ex. 8, Dkt. No. 148-2.)

## PROCEDURAL BACKGROUND

The government filed this action on January 21, 2011 in an effort to collect the estate's outstanding tax liability, asserting a cause of action against all defendants for trustee, transferee, and beneficiary liability under 26 U.S.C. § 6324(a)(2), and against the personal representatives under 31 U.S.C. § 3713. (Compl., Dkt. No. 2.)  Defendants filed a motion to dismiss the complaint. (Dkt. No. 31.) Following a hearing on that motion, the court determined that the government had adequately stated a claim that the trustees of the Trust may be personally liable for the unpaid estate tax to the extent of the value of the property in the Trust at the time of Decedent's death pursuant to 26 U.S.C. § 6324(a)(2). (*See* Am. Mem. and Decision, Dkt. No. 75.)  The court dismissed the government's claim, on the other hand, that each heir should be individually liable for the unpaid estate taxes as a transferee of Trust assets pursuant to that statute. (*Id.*)  Similarly, the court determined that the government's claim regarding each heir's potential individual liability for the estate's taxes as a beneficiary of Trust assets under Section 6324(a)(2) should be limited to the extent of the distributions they received from the Decedent's life insurance policies. (*Id.*) Finally, the court determined that the government had adequately stated a claim that the personal representatives may have individual fiduciary liability for the estate taxes under 31 U.S.C. § 3713, although it revised its reasoning as to why after resolving defendants' first motion to reconsider. (*Id.*)

After the court ruled on defendants' motion to dismiss, the defendants answered the government's Amended Complaint, which was filed on July 31, 2013 and included for the first time causes of action related to the Distribution Agreement. (Dkt. No. 79.) Subsequently, the parties filed cross motions for partial summary judgment on the government's first cause of action, namely whether Johnson and Smith, as successor trustees of the Trust, were personally

liable for unpaid estate taxes under 26 U.S.C. § 6324(a)(2) because that section only makes trustees liable up to the value of assets included in decedent's gross estate under 26 U.S.C. §§ 2034 to 2042, inclusive.[1]  Oral argument was heard on these motions on October 1, 2014, after which the court ruled on the record in favor of the government that the successor trustees were personally liable for the estate tax because the Trust assets were included in the Decedent's gross estate under a relevant section, namely 26 U.S.C. § 2036(a). Defendants have challenged this ruling in a Motion to Reconsider, which is now before the court. (Dkt. No. 119.)

At the October 1 hearing, the court also granted defendants' motion for leave to amend their answer to include the affirmative defense that the government's claims against Smith and Johnson as personal representatives and fiduciaries are barred because they were effectively discharged from personal liability in August 1997 as a result of their tender of a special lien under 26 U.S.C. § 6324A. Shortly before the deadline for dispositive motions, defendants moved for an extension of time to submit an expert report from Jeffrey S. Pickett to support that the value of the Hotel stock pledged as collateral at or near the time of their § 6324A election was more than sufficient to pay the remaining amount of the federal estate tax that had been deferred under 26 U.S.C. § 6166. Their motion was granted and defendants filed their second motion for

---

[1] For purposes of the prior motion to dismiss, defendants did not dispute that "trustees" were "transferees" that fall within the scope of Section 6324(a)(2). In this motion for summary judgment, defendant trustees argued that they can only be liable as transferees under this statute if the Trust assets were included in Decedent's gross estate under Sections 2034-2042, a position that was not at issue in the previous motion. *See* Section 2, *infra*. The court finds that this clarification of defendants' position was not clearly inconsistent with their position in the prior motion to dismiss, nor was their prior position calculated to mislead the court, nor did this clarification give defendants an unfair advantage. *See Hansen v. Harper Excavating, Inc.,* 641 F.3d 1216, 1227 (10th Cir. 2011). Defendants stated this position as their Fifteenth Defense in their Answer to Amended Complaint filed on August 27, 2013; the discovery deadline was still several months away when defendants clarified their position; and the government has always had the burden of proving that it has met all elements of its Section 6324(a)(2) claim. Because Section 6324(a)(2) is a strict liability statute that imposes liability based not on a trustee's improper acts, but on the status of being a trustee, receiving property, and having unpaid federal estate taxes, it is necessary for the court to fully consider each of the statute's elements and defendants' arguments without being constrained by prior statements when these questions were not directly at issue previously.

partial summary judgment on the grounds that Smith and Johnson were discharged from personal liability pursuant to their furnishing of the § 6324A special lien. This motion is before the court. (Dkt. No. 122.)

For its part, on March 17, 2015, the government timely filed its second motion for summary judgment on the remaining counts of its amended complaint, and part of this motion is now before the court. (Dkt. No. 117.) On July 21, 2015, the court held a hearing on the parties' second motions for summary judgment, defendants' motion for reconsideration, and defendants' motion for extension of time to submit expert reports. The court granted defendants' motion for an extension of time to submit expert reports. The court granted the government's second motion for summary judgment as to the defendants' personal liability for estate tax attributable to the life insurance proceeds received from the decedent. The court took the claims regarding the successor trustees' personal liability under submission. Defendants' motion for reconsideration and second motion for partial summary judgment were also taken under submission.

After both parties submitted expert reports and supplemental briefing regarding the expert reports and defendants' claims that Smith and Johnson should be discharged from personal liability as a result of satisfying the requirements for a special lien pursuant to § 6324A and thus obtaining a discharge pursuant to § 2204 such that they are not personally liable pursuant to § 3713, the court held a final hearing on the briefing on June 23, 2016. After consideration of the parties' extensive briefing, the relevant law, and the oral arguments by the parties, the court now rules on the following motions:  United States' Second Motion for Summary Judgment (Dkt. No. 117), Defendants' Motion to Reconsider (Dkt. No. 119), and defendant's Motion for Partial Summary Judgment (Dkt. No. 122).

## ANALYSIS

**1.    Failure to Substitute Estates as Defendants Requires the Court to Dismiss Defendants Marian S. Barnwell and Billie Ann S. Devine**

As a preliminary matter, the court begins by addressing the government's claims against the two deceased defendants. Notice of the September 1, 2015 death of defendant Billie Ann S. Devine was filed on September 21, 2015. (Dkt. No. 172.)  Notice of the April 17, 2016 death of Defendant Marian S. Barnwell was filed on May 16, 2016. (Dkt. No. 190.)  Rule 25(a)(1) of the Federal Rules of Civil Procedure governs the substitution of a party for claims that are not extinguished by a party's death. In this case, the government's claims against these two deceased heirs as the beneficiaries of Trust assets under Section 6324(a)(2) to the extent of the distributions they received from the Decedent's life insurance policies is not necessarily extinguished by their deaths and could potentially have survived against their estates. Rule 25, however, requires a motion for substitution of a party to be "made within 90 days after service of a statement noting the death." Fed. R. Civ. P. 25(a)(1). For Devine, that time expired in December 2015. For Barnwell, that time expired in August 2016. When a party—here the government—has failed to make a timely motion for substitution of a party, "the action by or against the decedent must be dismissed." *Id.* There has been no motion for substitution of either defendant here; accordingly, the court dismisses all of the government's claims against defendants Devine and Barnwell.

**2.    Motion to Reconsider Whether Trust Assets Were Included in Decedent's Gross Estate Under 26 U.S.C. § 2033**

The court now turns to defendants' motion to reconsider its decision to grant partial summary judgment to the government on the question of whether Smith and Johnson as

successor trustees are personally liable for the unpaid estate tax to the extent of the value of the property in the Trust under section 6324.

As successor trustees of the Trust, Johnson and Smith can be personally liable for unpaid estate taxes up to the value of the Trust assets under 26 U.S.C. § 6324(a)(2) only if the Trust assets were included in decedent's gross estate under 26 U.S.C. §§ 2034 to 2042, inclusive.[2] In their motion for partial summary judgment, defendants argued that Decedent's assets were included in her Estate under 26 U.S.C. § 2033,[3] rather than under 26 U.S.C. § 2036 or 26 U.S.C. § 2038, because the Decedent retained full beneficial ownership of all Trust assets during her lifetime and there was no transfer to any other Trust beneficiary until the time of her death. (Def.'s Mot. for Summ. J. 7, Dkt. No. 86.) By contrast, the government's motion for summary judgment on this claim argued that decedent's assets were either included in her estate under 26 U.S.C. § 2036(a) because they were transfers with a retained life estate,[4] or under 26 U.S.C. §

---

[2] The parties agree that the only possibly relevant sections within this range are section 2036 and section 2038.

[3] Section 2033 refers to property in which the decedent has an interest, and states:

> The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death.

26 U.S.C. § 2033.

[4] Section 2036 states:

> (a) General rule. The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—
> (1) the possession or enjoyment of, or the right to the income from, the property, or
> (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

26 U.S.C. § 2036.

2038 because the Decedent retained the power to alter, amend, revoke, or terminate the Trust.[5] (Gov. Mot. for Summ. J. 13-19, Dkt. No. 88.)  After oral argument on October 1, 2014, the court denied defendants' motion and granted summary judgment to the government on the claim that Smith and Johnson were personally liable for the unpaid estate tax as successor trustees of the Trust. (Dkt. No. 108.) The court concluded that the assets in the Trust, a fully revocable grantor trust, were included in Decedent's gross estate under 26 U.S.C. § 2036(a)(2) because as a result of the creation of the Trust and the designation of the beneficiaries therein, "at the instant of death the beneficiaries in this property had a legally enforceable interest." (Hr'g Tr. dated Oct. 1, 2014 49; Dkt. No. 113.)

Defendants have asked the court to reconsider this decision, arguing that the critical question for their claim that the Trust assets were included in the gross estate under 26 U.S.C. § 2033 is not whether the beneficiaries obtained a legally enforceable interest at the moment of Decedent's death, but rather *what interest the Decedent held* at the moment of her death. (Dft.'s Mot. to Reconsider 3, Dkt. No. 119.)  Defendants argue that the court's analysis of 26 U.S.C. § 2036 was in error because it incorrectly focused on the interests held by the beneficiaries immediately after the moment of death, rather than on the interests held by the Decedent during her life. (*Id.* at 7.)  From a temporal standpoint, in other words, the transfer envisioned by the fully revocable grantor trust executed by the Decedent during her lifetime only occurred as a

---

[5] Section 2038 states in pertinent part:

> (a)  In general. The value of the gross estate shall include the value of all property—
>> (1)  Transfers after June 22, 1936. To the extent of any interest therein of which the decedent has at any time made a transfer . . . *by trust* or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent . . . to alter, amend, revoke, or terminate, or where any such power is relinquished during the 3-year period ending on the date of the decedent's death.

26 U.S.C. § 2038 (emphasis added).

result of Decedent's death, and thus the assets remained beneficially owned by her during her lifetime and were includable in the Estate pursuant to 26 U.S.C. § 2033 rather than § 2036 or § 2038. They further argue that this temporal analysis was not originally briefed as to section 2036, *id.* at 3, although the court notes that the parties did present arguments on temporal considerations as to section 2038. The government argues that the court should not reconsider defendants' motion because it merely restates the position defendants took in their initial motion. (Gov.'s Opp'n Mem., Dkt. No. 143.)  Thus, the court first evaluates the legal standard required to grant a motion to reconsider.

### A.  *Legal Standard on a Motion to Reconsider*

Rule 54(b) of the Federal Rules of Civil Procedure provides, in relevant part:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b).

The government argues that although Rule 54(b) allows a court to revisit any order that rules on less than all of the claims in a case, a motion to reconsider is not appropriate when it merely restates the party's position taken in the initial motion.  *See Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (A motion for reconsideration is an "inappropriate vehicle[] to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion."). While defendants agree that "[a] motion to reconsider is not a second chance for the losing party to make its strongest case or to dress up arguments that previously failed," *United States v. Huff*, 782 F.3d 1221, 1224 (10th Cir. 2015), they note and the court agrees that the Tenth Circuit encourages a court to reconsider an interlocutory ruling "where error is apparent." *Warren v. Am.*

*Bankers Ins.*, 507 F.3d 1239, 1243 (10th Cir. 2007). Furthermore, "[a] district court always has the inherent power to reconsider its interlocutory rulings." *Id.*

The court agrees with the defendants that the key language of section 2033 requires the court to focus its analysis on what was "beneficially owned by the decedent at the time of his death," 26 C.F.R. 20.2033-1, rather than on the interests owned by the beneficiaries immediately after decedent's death, which it did at the October 1, 2014 hearing. Accordingly, based on the foregoing standard and to prevent clear error, the court proceeds to reconsider whether the Trust assets were included in Decedent's gross estate under 26 U.S.C. § 2033.

## B. Decedent Had Full Beneficial Ownership of All Trust Property During Her Lifetime; Thus Trust Assets Were Included in Her Gross Estate Under 26 U.S.C. § 2033

The court's focus during the October 1, 2014 oral argument for summary judgment on this issue was on how it should interpret the meaning of the term "transfer" for purposes of these estate tax statutes. (Hr'g Tr. dated Oct. 1, 2014 4; Dkt. No. 113.) While the court's analysis still revolves around the meaning of that term, the court erred by not also keeping in mind the overall estate tax statutory scheme. Upon reconsideration, the court finds that an evaluation of estate tax liability first requires the inclusion in the gross estate, under section 2033, of "the value of all property, whether real or personal, tangible or intangible, and wherever situated, beneficially owned by the decedent at the time of his death." 26 C.F.R. 20.2033-1. Other sections then apply to include in the gross estate certain gifts and/or transferred assets purportedly given away during decedent's lifetime where the decedent retained "strings" of control, whereas section 2033 "taxes property which has never really been given away at all." *Estate of Tully v. U.S.,* 528 F.2d 1401, 1403 (Ct. Cl. 1976).

Consistent with this statutory structure, the court must first analyze whether the Trust assets were ever "given away" such that Decedent lost the beneficial ownership of them during

her lifetime, or in other words, whether a "transfer" for purposes of sections 2036 and 2038 did or did not occur prior to Decedent's death. To do so, the court considers first the "legal interests and rights created [by the Trust] under [s]tate law," and then decides "whether the interests and rights so created are sufficient to justify including the property in the gross estate" under section 2033. *Estate of Watson v. Comm'r*, 94 T.C. 262, 270-71 (1990). Under Utah law, "[a] trust is a form of ownership in which the legal title to property is vested in a trustee." *Flake v. Flake (In re Estate of Flake)*, 2003 UT 17 ¶ 12, 71 P.3d 589. Trust creation also requires a settler's intent "to confer a beneficial interest in the property in some other person," *id.* at ¶ 11, although those beneficial interests can take effect via inter vivos or testamentary transfers. Thus, under the proper temporal analysis, a revocable grantor trust can potentially be included or not in a decedent's gross estate under section 2033, depending on its terms.[6]

Here, the grantor of the Trust was the Decedent. (Dkt. No. 86-2 ¶ 1.)  The Decedent was also the sole trustee of the Trust before her death, having previously exercised her right to revoke prior trust agreements that named co-trustees. (*Id.*) The Decedent, as grantor, had unlimited power to revoke, modify, alter, or amend the Trust at any time.[7] (*Id.* at 11 ¶ 12.) It is undisputed that during the Decedent's lifetime, she did not resign as trustee or become incapacitated such

---

[6] Merely reporting the Trust's assets on Schedule G of the Estate tax return is insufficient to cause the inclusion of Trust assets in the gross estate under sections 2035, 2036, 2037, or 2038, notwithstanding that Schedule G appears to assume it. IRS instructions require assets to be listed on Schedule G if a decedent created any trusts during his or her lifetime. (Def.'s Mot. Summ. J. 39-42, Dkt. No. 86.) Nor is the court willing to decide questions of trustee liability under section 6324 based on the correctness of a taxpayer's preparation of a form rather than on proper application of the code sections themselves.

[7] While Decedent's power to "alter, amend, revoke, or terminate" the Trust tracks the plain language of section 2038, it is not proper to conflate the plain language with the required initial analysis of beneficial ownership under section 2033. Section 2038 interests require that the benefits—not just the legal title— first be given away subject to these retained powers. Section 2033, on the other hand, is the provision by which the government "taxes property over which the owner has kept so much control that he has never really transferred it." *Tully*, 528 F.2d. at 1405, n. 11. Without a valid transfer, property never leaves the section 2033 gross estate. Were it otherwise, the plain language of section 2038 would swallow section 2033 in contravention of the estate tax structure.

that a successor trustee served in her place. The income and principal of the Trust could be withdrawn without restriction by the Decedent only, as grantor, during her lifetime.[8] (*Id.* ¶ 5A.) Only upon the grantor's death were the Trust assets to be distributed for the payment of expenses and debts and for distribution to the various beneficiaries of the Trust. (*Id.* ¶ 5B.)

Defendants do not dispute that Decedent's creation of the Trust changed the legal title of the Trust assets from ownership by Decedent personally to ownership by Decedent as the trustee of the Trust. While that is true, the beneficial ownership of the Trust assets never changed during Decedent's lifetime. "Actual command over the property taxed," as opposed to mere "refinements of title" are key to questions of "the actual benefit for which the [estate] tax is paid." *Burnet v. Guggenheim*, 288 U.S. 280, 283 (1933). Here, not only did the transfer of title to the Decedent as trustee not change Decedent's beneficial ownership of the Trust assets during her lifetime, but the beneficiaries of the Trust merely had a "hope and expectation" of inheriting a beneficial interest in the Trust assets, rather than any actual ownership interests during Decedent's lifetime.[9] *See Estate of Spruill v. Comm'r*, 88 T.C. 1197, 1222 (T.C. 1987). The government's argument focused heavily on the Trust's testamentary transfer of assets to the successor trustees—rather than to Decedent's estate—at the moment of death, claiming that "[t]he language of § 2033 reaches interests in property held by a decedent at his death (i.e., his

---

[8] The court is not persuaded by the government's argument that the Decedent's withdrawals were limited by her fiduciary duties as trustee because, as defendants point out, "a self-imposed duty to hold and manage assets for your own benefit is no duty at all." (Def.'s Combined Opp'n Mem. 25, Dkt. No. 97.) As a result, her fiduciary duties as trustee did not result in an inter vivos transfer that would take Trust assets out of Decedent's section 2033 gross estate.

[9] The court rejects the government's argument that the beneficiaries owned "vested interests" in the trust during Decedent's lifetime because of a provision relating to the rule against perpetuities. Similarly, the court does not find a transfer for purposes of section 2033 because the Trust language provided that the beneficiaries could designate one or more of their own heirs to receive Trust assets that a beneficiary would have been entitled to receive had he or she been alive at Decedent's death. None of the beneficiaries exercised this special power of appointment, and even if they had, their appointee(s) would have received nothing more than the beneficiaries had, which—during Decedent's lifetime—was only an expectancy.

estate), not beforehand." (Gov. Opp'n Memo 22, Dkt. No. 88.)  Upon reconsideration, however, the court concludes that unless Decedent transferred beneficial ownership of Trust assets during her lifetime, how or to whom they transferred upon her death—no matter how "instantaneous"—simply plays no part in the section 2033 analysis. (Gov. Reply 4-7, Dkt. No. 98.) *See* 26 C.F.R. 20.2033-1.

Defendants cite to an IRS Technical Advice Memorandum and an IRS Revenue Ruling to support the conclusion that a trust arrangement of this type does not transfer the beneficial ownership away from the decedent for purposes of section 2033. In IRS Technical Advice Memorandum 89-40-003, dated June 30, 1989, the IRS stated:

> In the present case, X was directed to invest the principal deposited by A and *distribute income and corpus as directed by A.* At A's death, any assets remaining were to be distributed to A's personal representative. The trustee's discretion was limited to investment decisions. Thus, the assets held in Trust Arrangement Y were held *solely for the benefit of A during A's lifetime* and were payable to A's estate on A's death. *Since there is no third party involved in the Trust Arrangement A is properly treated as the owner of the assets held in the Trust Arrangement at the time of her death. Accordingly, the assets held in the Trust Arrangement at the time of A's death are properly includible in A's gross estate under section 2033 and not section 2038 of the Code.*

I.R.S. Tech. Adv. Mem. 89-40-003 (June 30, 1989) (emphasis added). (Dkt. No. 86-4.)  The focus of this IRS ruling is not on the fact that technically, a legal transfer of assets to trustee X took place. Instead, the focus is on the fact that the sole economic and ownership benefit of these assets during A's lifetime was held by A. Compared to this analysis, defendants' case for inclusion of Trust assets under section 2033 is even stronger than the taxpayer in the memorandum because Decedent's creation of the Trust did not transfer title to a third party

trustee, such as X in the example above. Instead, it transferred title solely to herself during her lifetime, in her dual roles as grantor and trustee.[10]

Similarly, in IRS Revenue Ruling 75-553, the decedent created a fully revocable trust during her lifetime, with trust assets to be distributed to her estate upon her death. The issue the IRS considered was whether the bank trustee would be liable under 6324(a)(2) for any unpaid estate taxes. The IRS said "no" and stated:

> Although sections 2036, 2037, and 2038 of the Code include in a decedent's gross estate the value of any interest in property transferred by the decedent, in trust or otherwise, where a life estate, reversionary interest, or power to alter, amend or revoke is retained by the decedent, *these provisions of the Code do not become operative unless someone other than the decedent receives a beneficial interest in the transferred property. The transfer of property to a trustee acting as agent for the transferor, without a third party receiving any interest in the property, would not fall within the scope of sections 2036, 2037, and 2038.* In the instant case the trust corpus is payable to the decedent's estate and is property of the decedent within the meaning of section 2033 and is includible in the gross estate only under that section.

> *Accordingly, the trustee is not subject to transferee liability for estate tax pursuant to section 6324(a)(2) of the Code since the corpus of the trust was not includible in the decedent's estate under sections 2036, 2037, or 2038, but was includible under section 2033 exclusively.*

Rev. Ruling 75-553 (emphasis added). Here, again, the IRS was not focused on the fact of a technical transfer of title to a bank trustee, but rather on whether someone other than the decedent received a beneficial interest in the transferred property during the decedent's lifetime. Like the decedent in Revenue Ruling 75-553, the Decedent here beneficially owned all of the Trust assets up until the time of her death. Additionally, the IRS was not focused on the fact that upon the Revenue Ruling decedent's death, trust assets were distributed to his estate, as opposed

---

[10] In the cases cited by the government suggesting that a transfer for estate tax purposes takes place regardless of the transferee having dual roles, the court notes that in those cases, the transferees were not the same persons as the grantors, and the interpretations of sections 2033 and 2036 were not at issue. *See Bell v. Comm'r*, 82 F.2d 499, 500 (3d Cir. 1936); *Agnes McCue, Addressed as the Transferee of the Estate of John J. Nolan v. Comm'r*, 1946 Tax Ct. Memo LEXIS 248, *127-*128 (T.C. 1946).

to a beneficiary or to a testamentary trust. It is true that here, Decedent's Trust arrangement meant that Trust assets avoided probate and allowed retention of control over a closely held business after Decedent's death. But Trust asset passage through probate—or any other after-death process or event—is not relevant to what beneficial ownership of the property the Decedent held during her lifetime. The court finds that these IRS interpretations of the Code and its regulations are reasonable and are entitled to "substantial judicial deference."[11] *U.S. v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 220 (2001).

The court's original ruling erred in determining that the specific language of section 2036 was broad enough to make Decedent's creation of the Trust and transfer of legal title from the Decedent as grantor to the Decedent as trustee a "transfer" for estate tax purposes. (Hr'g Tr. dated Oct. 1, 2014 48; Dkt. No. 113.) The court also erred in determining that at the "instant of death" the beneficiaries had a legally enforceable interest such that Trust assets were properly includable in the estate pursuant to section 2036, *id.* at 48-50, because it was persuaded by the government's argument that sections 2036 and 2038 are "transfer provisions" intended to capture "all incomplete transfers, which includes transfers taking effect at death via revocable trusts." (Gov. Reply 6, Dkt. No. 98.) Upon reconsideration and for the reasons stated above, the court finds that Trust assets were never "given away" such that Decedent lost the beneficial ownership of them during her lifetime, and thus that there was no transfer—incomplete or not—for purposes of sections 2036 and 2038 prior to Decedent's death. As a result, the court concludes

---

[11]Additionally, while the court is persuaded by defendants' arguments that (1) the determination of what is included in the gross estate should be harmonized with how that property is valued under the tax code, and (2) that section 2035 can inform the court regarding why sections 2036 and 2038 do not apply to the Trust at issue here, it does not make its ruling on the basis of those arguments. (Def.'s Mot. to Reconsider 9, 16; Dkt. No. 119.) It is worth noting, however, that the IRS interpretations above are consistent with a statutory tax scheme that functions as set forth by defendants in their motion to reconsider, and that nothing in the government's response persuades the court otherwise. (Gov.'s Opp'n Mem. 8, Dkt. No. 143.)

that Trust assets were included in the gross estate pursuant to section 2033, which precludes Smith and Johnson's liability as trustees for the estate tax under 26 U.S.C. § 6324. The court vacates its prior grant of partial summary judgment to the government as to trustee liability, (Dkt. No. 108), and grants defendants' motion for partial summary judgment on this claim. (Dkt. No. 86.)

**3.      Second Cross-Motions for Summary Judgment**

The remaining claims for which the government seeks summary judgment are (1) that Smith and Johnson have fiduciary liability under 31 U.S.C. § 3713(b) for the unpaid estate tax in their capacities as personal representatives of the Estate, or, as alternatives, (2) that the government as a third party beneficiary may enforce the Distribution Agreement against the defendants or (3) that the government may foreclose its federal tax lien against the Distribution Agreement. Meanwhile, the defendants have moved for partial summary judgment on the grounds that Smith and Johnson were discharged from personal fiduciary liability for any unpaid estate tax under section 3713(b) because they furnished a section 6324A special lien agreement sufficient to pay the deferred taxes. The court begins with the legal standard for summary judgment.

**A.      Summary Judgment Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure governs the standard for summary judgment.  Under Rule 56(c), the court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1160 (10th Cir. 1999). "One of the purposes of a motion for summary judgment is to pierce the

pleadings and to assess the proof in order to ascertain whether there exists a genuine need for

trial." *Metro Oil Co. v. Sun Refining & Marketing Co.*, 936 F.2d 501, 504 (10th Cir. 1991).

"Once the moving party has properly supported its motion for summary judgment, the burden

shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that

there is a genuine issue for trial." *Sally Beauty Co., Inc. v. Beautyco, Inc.,* 304 F.3d 964, 971

(10th Cir. 2002). "An issue is genuine if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Id.* at 972 (internal punctuation omitted). If a reasonable jury

could not return a verdict for the nonmoving party, summary judgment is appropriate. *See*

*MacPherson v. Brinecell*, 98 F.3d 1241, 1246 (10th Cir. 1996).

> **B.    Defendants Smith and Johnson Furnished a Valid Section 6324A Special Lien That Discharged Their Personal Liability under Section 2204 and Precludes Section 3713 Personal Liability**

Having determined that defendants Smith and Johnson are not personally liable for the

unpaid estate taxes in their capacities as trustees of the Estate, the court next turns to the question

of whether Smith and Johnson are personally liable for the unpaid estate taxes in their capacities

as personal representatives of the Estate. Because the government's claim for section 3713

liability will be rendered moot if the court determines that Smith and Johnson's personal liability

was discharged under section 2204 as a result of furnishing a valid section 6324A special lien,

the court begins with the requirements for discharge under section 2204 and then considers the

question of whether defendants furnished a valid special lien under section 6324A.

> **i.    Defendants Made an Effective Application for Discharge Under 26 U.S.C. § 2204**

The general rule that allows fiduciaries such as executors or personal representatives of

an estate to be discharged from personal liability for unpaid federal estate tax is that the fiduciary

either pays the estate tax owed as determined and notified by the IRS, or, in the case of assessed

tax payments deferred under section 6166, by "furnishing any bond which may be required for any amount for which time for payment is extended." 26 U.S.C. § 2204(a). The IRS regulation goes on to clarify that furnishing a bond for purposes of this section is met by furnishing a valid special lien agreement under 26 U.S.C. § 6324A.[12]  Smith and Johnson argue that they furnished a valid special lien agreement to the IRS under 26 U.S.C. § 6324A; therefore, whether or not the IRS formally acknowledged or provided receipt stating their personal liability was discharged, their personal liability for the Estate's federal tax was nevertheless discharged as a matter of law. (Def.'s 2nd Mot. Summ. J., Dkt. No. 122.)  The government argues that discharge under 26 U.S.C. § 2204(a) requires, as a prerequisite, a written application for discharge, which it claims the defendants failed to provide. (Gov.'s Opp'n, Dkt. No. 135.)

Notwithstanding the government's insistence that a written application is required for discharge, it has entirely failed to demonstrate that section 2204 or any applicable authorities or regulations require a specific format, form, or wording to make an application for discharge. While section 2204 provides that a taxpayer may make a "written application . . . for determination of the amount of the tax and discharge from personal liability therefor," the government has only identified that the application should be made to "the applicable internal revenue officer with whom the estate tax return is required to be filed." 26 C.F.R. § 20-2204-1. The purpose of the application, according to the text of the statute and regulations, is for the government to provide the fiduciary with a determination of the amount owed. *See id.*; 26 U.S.C.

---

[12] Specifically, 26 U.S.C. § 2204(c) provides that:

> [An] agreement which meets the requirements of section 6324A [26 USCS § 6324A] (relating to special lien for estate tax deferred under section 6166 [26 USCS § 6166] shall be treated as the furnishing of a bond with respect to the amount for which the time for payment has been extended under section 6166 [26 USCS § 6166].

§ 2204(a). Discharge, however, is conditioned only on payment of the amount owed or the furnishing of an appropriate lien or bond. *Id.*

In this case, as a result of the prior tax court proceeding about the value of the Hotel shares and the second tax assessment in 1996 based on that settlement, both parties were already fully aware of the amount of the tax owed by the Estate in August 1997 when the defendants furnished their special lien. There is no dispute on that point. The court is not persuaded that a separate written application is a substantive requirement of section 2204 because it appears that its essential purposes are fulfilled not by a written application but by the payment of the tax assessed or the furnishing of an appropriate bond. *See Baccei v. United States*, 632 F.3d 1140, 1145 (9th Cir. 2011) ("Substantial compliance with regulatory requirements may suffice when such requirements are procedural and when the essential statutory purposes have been fulfilled.") (internal punctuation omitted). Because a separate written application is not a substantive prerequisite, the court concludes that if the defendants furnished a valid special lien under section 6324A, as a matter of law their personal liability as fiduciaries was discharged.

Even if the court is incorrect and section 2204 requires a written application as a prerequisite to discharge, the court finds that the written communication between defendants and the government leading up to defendants furnishing the special lien agreement constitutes a written application pursuant to section 2204. The government initiated this communication. The first sentence of Ms. Girard's May 27, 1997 letter states that "The purpose of this letter is to inform you of an alternative to your continued personal liability for the unpaid estate tax of the Estate of Hazel Anna S. Smith that was deferred under 26 U.S.C. Section 6166." (Ltr. from Ms. Girard to Johnson dated May 27, 1997*;* Dkt. No. 122-2.)  The government claims that the letter was sent to protect its interest in the deferred tax payments, and it is true that later in the first

paragraph, the letter states that "This letter is being sent at this time because the government's interest must be adequately protected during the remaining period of your Section 6166 installment election." (*Id.*)  Having so stated, however, the letter goes on to state that "In order to insure protection of the government's interest *and to terminate your personal liability,* you as personal representative of the estate may elect . . . [among other things] to furnish a Special Lien for Estate Tax Deferred Under Section 6166, as described in 26 U.S.C. Section 6324A." (*Id.*) (Emphasis added.)  The next two paragraphs of the letter go on to describe in detail the requirements for electing a special lien, something the agent does not do with respect to the other options she suggested. The letter also specifically states that "We have attached information to assist you in completion of the *application* to elect the special lien." (*Id.*) (Emphasis added.)  The information attached to the letter was an agreement form for the Agreement to Special Lien under IRC 6324A, which the defendants completed and submitted prior to the IRS's deadline.

These facts are undisputed. In light of them, along with the government's failure to identify any other form, method, procedure, or policy by which a "written application" is otherwise properly made (assuming that a written application is a prerequisite), the court concludes in the alternative that Smith and Johnson properly made a written application for discharge under section 2204 when they timely followed the directions provided to them by the IRS, who demonstrably understood that it was offering defendants a discharge of personal fiduciary liability, even if in so doing it did not explicitly reference section 2204.[13] Having thus concluded that the parties understood that an application for discharge was both suggested by the

---

[13] Section 2204 also provides a special rule in the case of estate tax deferred under section 6166, namely, that the government may provide the personal representative or executor a statement of the bond (or lien) required "to be furnished within 9 months after receipt of the application," but "if no notification is received, the executor is discharged at the end of such 9 month period from personal liability for the tax the payment of which has been extended." 26 CFR § 20.2204-1. It is undisputed here that the government did not provide any notice of any additional lien or bond amount it required at any time following receipt of defendants' special lien agreement.

IRS and made by the defendants, the court next evaluates whether defendants made a valid special lien election.

ii.     **Defendants Smith and Johnson Furnished a Valid Section 6324 Special Lien**

When a personal representative elects to defer estate tax payments under 26 U.S.C. § 6166, he or she can furnish a special lien on certain property in favor of the United States. If the three requirements for a valid special lien under 26 U.S.C. § 6324A are met, the IRS must accept the special lien in lieu of a general lien under section 6324, 26 U.S.C. § 6324A(d)(4), and "the deferred amount . . . shall be a lien in favor of the United States on the section 6166 lien property." 26 U.S.C. § 6324A(a).

The first requirement to furnish a lien under section 6324A is for the personal representative to make an election. The Code of Federal Regulations states that "the election is made by applying to the Internal Revenue Service office where the estate tax is filed" before the tax and interest are paid in full. 26 CFR § 301.6324A-1(a). The government does not dispute that the timeliness requirement was met here. The regulations go on to state that the "application is to be a notice of election requesting the special lien . . . and is to be accompanied by the [Agreement to lien]." *Id.* The government has also not disputed that defendants made a notice of election requesting the special lien and that it was accompanied by the lien agreement document. Accordingly, this requirement was met.

The second requirement to furnish a lien under section 6324A is for the personal representative to file a proper agreement that contains (1) signatures by all parties having an interest in the property consenting to the lien, (2) decedent's name and Social Security number, (3) the amount of the lien, (4) the fair market value of the property subject to the lien on the date of decedent's death as well as on the date of the election, (5) the amount of encumbrances to the

property on both dates, as above, (6) a clear description of the property subject to the lien, and

(7) designation of an agent for the beneficiaries of the estate and parties consenting to the lien for

all dealings with the IRS. 26 CFR § 301.6324A-1(b). It is undisputed that the Agreement to

Special Lien Under IRC Section 6324A filed by the defendants in August 1997 met the above

requirements. Although the government implies that the subsequent encumbrance of the Hotel

stock in 1999 or 2000 creates a dispute that the defendants did not treat the stock as if was

subject to a special lien, this is not a genuine dispute of material fact for two reasons. First, at the

time the agreement was submitted to the IRS, defendants correctly noted that the stock was

unencumbered. It only became encumbered several years after the agreement was filed. Second,

special lien property is not required to start out as or remain unencumbered under section 6324A;

in fact, section 6324A(b)(2)(B) anticipates that the initial valuation of lien property should take

into account any encumbrances, and section 6324A(d)(3) provides instructions as to the priorities

of security interests. Furthermore, the statute allows the IRS to accelerate the deferred payments

if at any time it determines the value of the special lien property is not adequate. 26 U.S.C. §

6324A(d)(5). As a result, the fact that defendants subsequently used the Hotel stock as collateral

does not invalidate the previous creation of a proper lien and the second requirement has been

met.

The third and final requirement to furnish a lien under section 6324A is that the section

6166 lien property (i.e. the collateral) must satisfy the requirements of the statute. The statute

requires the lien property to be an interest "in real and other property to the extent such interests

can be expected to survive the deferral period, and are designated in the agreement." 26 U.S.C. §

6324A(b)(1). And, although the IRS cannot require the lien property to have more than a

maximum value consisting of the deferred tax amount plus the required interest, the statute does

not require the lien property to have a minimum value to create a special lien in the property. *Id.* at (b)(2). While the government does not dispute that the Hotel stock was properly designated in the agreement, it disputes whether the stock was expected to survive the deferral period and whether its value was sufficient. The court does not find that either claim is a genuine dispute of material fact and addresses them separately below.

(a)      Survival

The government disputes the Report of Jeffrey S. Pickett, defendants' expert, as to the history of the business and its claim that the Hotel had been in operation for decades without interruption or financial stress, which supports the survivability of its stock. (Gov.'s Opp'n 9, Dkt. No. 135.)  The government also claims that the internal memorandum statement of its agent, Ms. Girard, that "I have analyzed the security and feel a lien under IRC 6324A against the stock will adequately secure the liability **for the remainder of the IRC 6166 election**" is not binding on the government. (IRS Memo. dated Aug. 21, 1997; Dkt. No. 122-2, p. 13.) (Emphasis added.)

With respect to defendants' expert report, the court reiterates that while it is defendants' burden to come forth with evidence to support its motion for summary judgment, once they have done so, the burden shifts to the government to "set forth specific facts showing that there is a genuine issue for trial." *Sally Beauty Co.*, 304 F.3d at 971. After the court granted defendants' motion to submit its expert's report, it authorized the government to submit its own expert report. The government's expert report does not set forth any specific facts suggesting that the Hotel's financial stability or history were not as represented. (Expert Review Report of Don M. Drysdale, Dkt. No. 176-1.) In fact, the report states only that Mr. Pickett's report should have included additional information about facilities, organizational structure, management team, classes of equity interests and rights attached thereto, products or services offered, and strategy

30

and future plans to assist the government in assessing risk. (*Id.* at 11-13.) The government argues that a jury could infer from its expert's report that the defendants failed to meet their burden to come forth with evidence supporting the survivability of the lien property. The court disagrees. Without specific facts showing a genuine dispute as to the parties' expectations about the survivability of the Hotel stock, it is the government who has failed to meet its burden.[14]

Perhaps more importantly, however, Ms. Girard's statement constitutes a party admission by the government that it had, in fact, evaluated the survivability of the Hotel stock for the duration of the deferral and found it to be adequate at the time it was offered. The government argues that an IRS agent's statement cannot bind the agency and for support refers the court to *Sidell v. Comm'r*, 225 F.3d 103, 111 (1st Cir. 2000); *Connecticut Gen. Life Ins. Co. v. Comm'r*, 177 F.3d 136, 145 (3d Cir. 1999); *Armco, Inc. v. Comm'r*, 87 T.C. 865, 867 (T.C. 1986); and *Honeywell, Inc. v. United States*, 661 F.2d 182, 185-86 (Ct. Cl. 1981). These cases, however, reference individual agent views about or interpretations of IRS regulations and policies. As a result, they do not apply here to Ms. Girard's statement about her factual evaluation that the Hotel stock would survive the deferral period, which is neither a regulation nor a policy. As a

---

[14] Furthermore, as to survivability, the IRS Office of Chief Counsel has provided internal guidance that although

> "[t]here is a risk that the Service may err in its conclusion [about the survivability of closely held stock] . . . Congress intended that the Service bear such a risk. Comm. on Ways and Means, 94[th] Cong., <u>Background Materials on Federal Estate and Gift Taxation 302,</u> (Comm. Print 1969) ("[t]he Government will not only permit the deferral of taxes, but will bear part of the risk that the illiquid asset may decline in value during the deferral period"). If Congress had intended that the Service be assured payment, Congress would have required that a bond be provided to the Service for deferred estate taxes.

IRS CCA 200747019 (IRS 2007). (Dkt. No. 122-1, p. 21.)  Although letter rulings and memoranda such as this are not precedent, courts commonly rely on such statements because they "reveal the interpretation put upon the statute by the agency charged with the responsibility of administering the revenue laws." *Estate of Roski v. Comm'r,* 128 T.C. 113, 120 (T.C. 2007)*; Thurman v. Comm'r*, T.C. Memo 1998-233 (T.C. 1998); *Hanover Bank v. Comm'r*, 369 U.S. 672, 686 (1962).

result, Ms. Girard's admission persuades the court that there is no genuine dispute of fact that defendants met the survivability requirement for a special lien.

(b)     Value

Although the parties' biggest apparent dispute about the special lien requirements is whether the value of the Hotel stock was sufficient, the court finds this dispute to be nonmaterial. First, section 6324A does not require a minimum value to be met for a special lien to arise. Taxpayer election of lien property expected to survive the deferral period and designated in an appropriate agreement "*shall be a lien* in favor of the United States on the section 6166 property." 26 U.S.C. § 6324A(a) (emphasis added). Thus, the government's contention that it properly rejected the lien property because of "uncertain market value" is not well taken. If the value of lien property is too low, is does not mean that the special lien did not arise, it just means that the government is under-secured. The government's remedy for insufficient value to secure deferred tax obligations is to accept a bond in the amount of the shortfall, 26 U.S.C. § 6324A(b)(3), or to require the addition of property to the special lien agreement. 26 U.S.C. § 6324A(d)(5). It is undisputed that rather than making such specific requests, the government instead purported to reject the Hotel stock as collateral. But, because section 6324A is a taxpayer election, nothing in the statute authorizes the government to reject the election. It must be consented to not by the government, but by "all parties having any interest on the property" that creates the lien, as it was here. 26 CFR § 301.6324A-1(b).

Furthermore, the court is not persuaded that the government's attempt to reject the stock was based on consideration of its value as opposed to consideration of its nature. As explained above, Ms. Girard's letters and memoranda constitute party admissions. Ms. Girard's rejection letter dated November 6, 1997 states "Thank you for the information you provided. As I stated,

this District has not accepted closely held stock as security for the remainder of IRC 6166 elections." (Dkt. No. 122-2, p. 15.)  After informing defendants that she had sought guidance from District Counsel, Ms. Girard went on to state that "They have advised our office that closely held stock should not be accepted as collateral by the Internal Revenue Service because the IRS can not sell stock at a public auction as it violates securities regulations." (*Id.*) A review of Ms. Girard's internal memorandum seeking guidance from District Counsel shows that she reported that "The four Smith children are offering 4,768 shares of stock giving the security pledged a value of $6,092,578" for an unpaid assessment of $1,889,970 and an amount of security required of $2,192,365.20. (*Id.*)  She then stated that "I have analyzed the security **and feel a lien under IRC 6324A against the stock will adequately secure the liability** for the remainder of the IRC 6166 election." (Emphasis added.)  Ms. Girard then went on to state that "The District does not have any IRC 6324A liens against stock" and asked for guidance regarding security consisting of stock in a closely held corporation. (*Id.*) Ms. Girard's concern, then, was not value, as she appeared to find it adequate, but rather the nature of the property. [15]

Nothing about the nature of closely held businesses permits rejection of the security by the IRS. The IRS has previously accepted special liens under section 6324A in closely held businesses. *IRS v. Skiba* (In re Roth), 301 B.R. 451 (W.D. Pa. 2003) (286 shares in closely held car dealership); *Center Heights Lumber Co. v. United States*, 1999 U.S. Dist. LEXIS 7495 (S.D. Ind. 1999) (1995 creation of 6324A lien on closely held stock). Nothing in the plain language of section 6324A provides a mechanism for the IRS to reject the section 6166 collateral if it meets

---

[15] The government also argues that Ms. Girard's follow-up letter dated January 20, 1998 is a discussion about the IRS's concerns about the fair market value of the closely held stock as opposed to a discussion of its nature. Even if the government is correct, a special lien in the Hotel stock offered by defendants' agreement still arose, and could not be rejected because the government failed in its obligation to value the stock at the time of the election and make a request for a specific amount of additional property or bond it believed it required as security.

the requirements of the statute. Furthermore, the title of section 6166 specifically contemplates acceptance of liens in closely held businesses: "Extension of time for payment of estate tax where estate consists largely of interest in closely held business." Case law discussing the purpose of section 6166 suggests that the government's argument that it cannot (or should not) accept stock in closely held businesses for special liens to secure taxes deferred under section 6166 is unsupported. *Roski,* 128 T.C. at 129-130 (stating that section 6166 was enacted because existing law was "inadequate to deal with the liquidity problems experienced by estates in which a substantial portion of the assets consist of a closely held business."); *Estate of Bell v. Comm'r*, 928 F.2d 901, 902 (9th Cir. 1991) ("The purpose of section 6166 is to prevent the forced liquidation of closely held businesses because substantial estate taxes must be paid."). And, according to IRS Chief Counsel, the IRS must accept the collateral if it meets the requirements and has no authority to reject it because it prefers alternative collateral.[16] IRS CCA 2008030016 (IRS 2007). (Dkt. No. 122-1, p. 32.)

To the extent that the government's argument about the stock's value is not that the special lien did not arise, but rather that the discharge under section 2204 would not have automatically occurred had the lien been insufficient to cover the unpaid tax and interest, the court refers again to the applicable burden of proof. Defendants have presented evidence that at

---

[16] Specifically, the memorandum states:

> If the three requirements under I.R.C. § 6324A are met, the I.R.C. § 6324A special lien arises and *the collateral must be accepted* by the Service. The Service does not have the authority to reject collateral proffered by the Estate on the grounds that it would be burdensome for the Service to determine the value. *Nor does the Service have the authority to reject collateral proffered by the Estate because the Service would prefer other collateral.* Congress gave the Service a very limited role in the creation of the I.R.C. § 6324A special lien:  the Service determines whether the statutory requirements have been met. *If the statutory requirements have been met, the special estate tax lien arises under the statute and the Service must accept the Interest.*

IRS CCA 2008030016 (IRS 2007). (Emphases added.)

the time they applied for the special lien, the value of the offered stock was nearly triple the amount of unpaid tax and interest.[17] (Agreement to Special Lien Under IRC Section 6324A, Dkt. 122-2, p. 9.)  Defendants have also presented Ms. Girard's party admission that the stock would "adequately secure the liability."[18] (Dkt. No. 122-2, p. 15.) In addition to this, the defendants have presented evidence from their expert witness that on the two relevant dates, the stock pledged as collateral was worth $4,710,000 as of June 2, 1992 and $5,800,000 at the time of the furnishing of the Special Lien Agreement on August 4, 1997. (*See* Dkt. No. 122 ¶ 18, pp. 10, 22; and Pickett Report (Ex. 10 thereto) at 032-038.)  In response to this evidence, the government's expert, Mr. Drysdale, has only opined that Mr. Pickett overvalued the Hotel stock, but he has failed to provide his own valuation. Just as with the government's argument about survivability, the government argues that a jury could infer from Mr. Drysdale's report that the defendants failed to meet their burden to come forth with evidence supporting the sufficiency of the value of the lien property. The court disagrees. Without specific contrary facts from which a jury could find that the stock value was less than the amount owed—and not just lower than Mr. Pickett's valuation—it is again the government who has failed to meet its burden to rebut the defendants' evidence. *MacPherson*, 98 F.3d at 1245 ("[M]ore than a mere "scintilla" of evidence is needed to create a genuine issue of material fact.").

---

[17] The $1,273 value per share was based upon the settlement reached with the IRS in the tax court case in 1996.

[18] While Ms. Girard's January 20, 1998 letter subsequently raised questions about whether this value for purposes of the estate tax assessment was the appropriate value for security purposes, it never actually valued the stock. (Ltr. from Ms. Girard dated Jan. 20, 1998; Dkt. No. 122-2, pp. 19-20.) The IRS is the party with the duty to value the stock if it disagreed with defendants' valuation, and it failed to perform this duty. Neither is the court persuaded by the government's argument now that Ms. Girard's subsequent letter represents that she believed the stock had no value, or at least a value less than the amount of tax and interest owed.

For the foregoing reasons, the court finds that the three requirements for a valid special lien are met under 26 U.S.C. § 6324A. Therefore, the IRS had no discretion to reject the special lien, and that lien constitutes the bond required pursuant to the discharge statute. 26 U.S.C. § 2204. Consequently, Johnson and Smith's fiduciary liability as personal representatives of the Estate for the unpaid estate tax was discharged as a matter of law and the government's claim for fiduciary liability under 31 U.S.C. § 3713(b)  is moot.

## 4.     Statute of Limitations Expired on Contract Enforcement Claim

The court now turns to the government's claim seeking to enforce the terms of the Distribution Agreement against the defendants, which was raised for the first time in the government's Amended Complaint filed July 31, 2013.[19] (Am. Compl. 12, Dkt. No. 77.) The government claims that the December 31, 1992 agreement between Smith and Johnson in their capacities as trustees of the Trust and personal representatives of the Estate and the four defendant beneficiaries is a contract to which they are third party beneficiaries. The government seeks one quarter of the unpaid estate tax and interest due from each beneficiary as a result of this language in the contract:

> A portion of the total federal estate tax upon the Estate of Anna Smith is being deferred and is the equal obligation of the BENEFICIARIES to pay as THE SAME becomes due. Likewise, if, upon audit, additional federal estate taxes . . . are found to be owing, the responsibility for any such additional taxes, interest or penalties will be borne equally by the BENEFICIARIES.[20]

(Agreement ¶ 6, p. 2; Dkt. No. 32-8.)

---

[19] In the Amended Complaint, the contract enforcement claim is the government's fourth cause of action. (Dkt. No. 77.)

[20] Because the deceased beneficiaries have been dismissed from this case, at best the government's claim is for one quarter of the unpaid estate tax and interest due each from Smith and Johnson as the surviving beneficiary parties to the contract.

Defendants do not dispute that the Distribution Agreement is a contract and that the government is a third party beneficiary with rights under the agreement. Defendants argue, instead, that the government's rights are time barred due to the applicable six year state statute of limitations on contract claims. Utah Code. Ann. § 78B-2-309(2). The "statute of limitations ordinarily begins to run when the breach occurs." *Butcher v. Gilroy*, 744 P.2d 311, 313 (Utah Ct. App. 1987). When a party refuses to perform under a contract, the limitation period begins to run. *See S&G Inc. v. Intermountain Power Agency*, 913 P.2d 735, 740-41 (Utah 1996). The facts are undisputed. The deferred tax owing as a result of the section 6166 election was about $1.5 million, interest payments on which were paid until the Hotel's bankruptcy proceedings in 2002. At that time, Smith and Johnson requested a one year extension to pay the next estate tax installment due. When no payments were made thereafter, the IRS sent delinquent billing notices dated August 28 and December 2, 2003, the latter of which demanded payment by December 15, 2003 and stated that if payment was not received, "the whole balance of the account will be due immediately." It is undisputed that no payments were made and that the section 6166 payment extension defaulted as of December 15, 2003. When the beneficiaries failed to pay their respective shares of the tax due as of that date, each of them breached the Distribution Agreement. This breach, according to the defendants, initiated the running of the state statute of limitations for contracts that expired six years later on December 15, 2009. It is also undisputed, the court notes, that the IRS did not become fully aware of the Distribution Agreement and its terms until June 2005, when counsel for defendants sent a copy to the IRS. Even if the court uses June 2005 as the date triggering the running of the statute of limitations, without deciding that it must, it had expired no later than June 2011, which is two years prior to the government filing its Amended Complaint containing the breach of contract claims.

For its part, the government claims that the applicable statute of limitations is not the state statute of limitations for contracts, but the federal statute of limitations on collections of tax assessments pursuant to 26 U.S.C. § 6502.[21] (United States' Reply Mem. 18, Dkt. No. 146.) ("When the United States uses a state law remedy to collect taxes, its ability to do so is not governed or shortened by state procedural rules or state law limitations. Instead § 6502 of the Internal Revenue Code and any applicable federal extensions control limitations.") Upon review of the relevant case law, the court concludes that the government is incorrect on the facts of this case.

The government points the court to *U.S. v. Summerlin*, a 1940 case where the United States was the assignee of a creditor's claim against the estate of a decedent. 310 U.S. 414 (1940). In *Summerlin*, the Supreme Court reversed a determination that a Florida state statute of limitations applied when the United States, acting in its governmental capacity, becomes entitled to a claim and asserts its claim in that right. *Id.* at 417. To foreclose any argument that § 6502(a) is not the relevant statute of limitations here, the government cites *U.S. v. Galletti* for the proposition that "the limitations period resulting from a proper assessment governs the extent of

---

[21] Section 6502(a) provides the following limitations period as to collections after assessment of tax:

    (a)  Length of period. Where the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the proceeding begun—

        (1)  Within 10 years after the assessment of the tax, or

        (2)  if

            (A)  There is an installment agreement between the taxpayer and the Secretary, prior to the date which is 90 days after the expiration of any period for collection agreed upon in writing by the Secretary and the taxpayer at the time the installment agreement was entered into; or

            (B)  There is a release of levy under section 6343 after such 10-year period, prior to the expiration of any period for collection agreed upon in writing by the Secretary and the taxpayer before such release.

If a timely proceeding in court for the collection of a tax is commenced, the period during which such tax may be collected by levy shall be extended and shall not expire until the liability for the tax (or a judgment against the taxpayer arising from such liability) is satisfied or becomes unenforceable.

time for the enforcement of the tax liability." 541 U.S. 114, 123 (2004) (internal punctuation

omitted) (citing *U.S. v. Updike*, 281 U.S. 489 (1930)). The Tenth Circuit followed these

precedents in a case where the government sought to collect a tax assessment against the sole

shareholder distributee of a now-defunct corporation taxpayer in *U.S. v. Holmes*, 727 F.3d 1230

(10th Cir. 2013). The shareholder defended on the basis of a Colorado state statute of limitations

for collections by creditors of a dissolved partnership. *Id.* at 1232. The Tenth Circuit stated that

determining "[w]hether in general a state-law action brought by the United States is subject to a

federal or state statute of limitations is a difficult question," but that in *Holmes*, notwithstanding

that the government was "invoking a provision of state law" to hold the shareholder accountable

for the liability of the taxpayer corporation, the reality was that "the present suit, though not

against the corporation but against its transferee to subject assets in his hands to the payment of

the tax, is in every real sense a proceeding in court to collect a tax." *Id.* at 1235. As a result, the

Tenth Circuit determined that federal law, not the state statute of limitations, governed the time

limit on collections enforcement. *Id.*

The court also located a 1965 Sixth Circuit case that appears to have applied *Summerlin*

in circumstances factually similar to those at issue here. In *U.S. v. Parker House Sausage Co.*,

344 F.2d 787 (1965), defendant Parker House entered into a sales contract to purchase real estate

subject to a tax lien for the seller's withholding taxes. The contract provided that the purchaser

would assume and pay the tax liabilities. The government filed suit for payment of the tax as a

third party beneficiary of the sales contract requiring Parker House as purchaser to pay the

liability. Defendants pled the Michigan six-year statute of limitations for contracts as a defense,

claiming that the government's action did not seek to enforce a tax liability against it (as it was

not the taxpayer), but was instead a civil action for breach of contract and thus subject to the

state statute of limitations. Without analysis, but citing to *Summerlin*, the Sixth Circuit rejected the defense and stated that "[t]he United States is not barred in an action brought to enforce its claim by a state statute of limitations." *Id.* at 788.

Based on a subsequent U.S. Supreme Court ruling, however, the court concludes that *Parker House* was decided incorrectly. In *U.S. v. California*, 507 U.S. 746 (1993), the Supreme Court indicated that a more robust analysis of the cause of action under which the government is proceeding is required before simply relying on the general assertion in *Summerlin* and related cases that the government is not bound by state statutes of limitations. *U.S. v. California* involved the government's attempt to recover taxes it paid that it alleges were wrongfully assessed against one of its private contractors under California law. The initial cause of action it asserted was a federal common law cause of action for "money had and received," an implied-in-law contract. *Id.* at 749. The Supreme Court first determined that the government did not have a federal cause of action for an implied contract because its position in the proceeding was essentially that of a subrogor of the private contractor's claims against California. *Id.* at 756. The private contractor's rights as subrogee had lapsed under the state statute of limitations and its claims were barred; thus, under traditional subrogation principles, the United States' claims would also be time barred. *Id.* The government argued that its claims were not limited by the state's statute of limitations on the basis, among other cases, of *Summerlin*'s statement that "[w]hen the United States becomes entitled to a claim, acting in its governmental capacity, and asserts its claim in that right, it cannot be deemed to have abdicated its governmental authority so as to become subject to a state statute putting a time limit upon enforcement." *Summerlin, supra,* at 417. The Supreme Court disagreed. It proceeded to distinguish *Summerlin* and the other cases relied on by the government on the basis that, first, in those cases the rights upon which the

government were proceeding were "obtained by the Government through, or created by, a federal statute," and second, because in those proceedings, "[t]he government was proceeding in its sovereign capacity." *Id.* at 757. While the Court ultimately did not provide a definitive answer as to "[w]hether in general a state-law action brought by the United States is subject to a federal or state statute of limitations," it did determine that *Guaranty Trust Co. v. United States*, 304 U.S. 126 (1938), provided guidance, namely, that if "the proof demonstrated that the United States never acquired a right free of a pre-existing infirmity, the running of limitations against its assignor," then "[e]ven if the United States had a right to be free from the statute of limitations, it was deprived of no right on these facts." *U.S. v. California* at 758. In other words, "[b]ecause the Government waited until after the state statute of limitations had run against [its private contractor] to bring suit, the Government was not subrogated to a right free of a pre-existing infirmity." *Id.* at 758-59 (internal punctuation omitted).

*U.S. v. California*, then, requires this court to first evaluate the nature of the government's claim to determine whether it was obtained through or created by a federal statute, and second, to determine whether it is pursuing the claim in its sovereign capacity. Only if it meets those requirements has it acquired a right not barred by the state statute of limitations. Here, the parties all agree that the nature of the government's claim is as a third-party beneficiary to the contract entered into by Smith and Johnson as trustees of the Trust and personal representatives of the Estate with the four defendant children. While the underlying estate tax debt was created by federal statute, the government's breach of contract claim was not obtained through, or created by a federal statute, but by virtue of the government being an intended third-party beneficiary of a contract governed by state law. *See U.S. v. California* at 757. This fact means that the state statute of limitations period, not the federal limitations period, applies to the

breach of contract claim. The government also cannot meet the second requirement to avoid being subject to the state statute of limitation, because to prevail in the breach of contract claim, it must proceed as a third-party beneficiary rather than in its sovereign capacity.[22] *See id.* As a third-party beneficiary, the government stands in the shoes of and "takes on the rights *and limitations*" that Smith and Johnson have as trustees and/or personal representatives to enforce the right of contribution against the beneficiaries, "one limitation being a time limit for filing civil suits." *See Flying Phoenix Corp. v. Creative Packaging Mach., Inc.*, 681 F.3d 1198, 1201 (10th Cir. 2012). *See also Rio Algom Corp. v. Jimco Ltd.*, 618 P.2d 497 (Utah 1980) (stating that third party beneficiaries are not entitled to greater rights than the actual parties to a contract). In the language of *U.S. v. California*, the government acquired a right with a "pre-existing infirmity," i.e. the state statute of limitations. *U.S. v. California* at 759. After stepping into Smith and Johnson's shoes as a third-party beneficiary, the government then waited until after the limitations period had run to bring suit against the contract beneficiaries. Accordingly, the court finds that the government's claim for breach of contract is time barred.

**5.      The Government Cannot Foreclose Its Section 6321 Lien Against an Expired Asset**

The government's final claim[23] seeks to foreclose its federal tax lien, which arose pursuant to 26 U.S.C. § 6321 at the time the tax was assessed, against any rights which were created by the Distribution Agreement. The parties each raise numerous arguments for and

---

[22] Notwithstanding the Tenth Circuit's language in *Holmes* that "the present suit . . . is in every real sense a proceeding in court to collect a tax," the facts here are distinguishable from those in *Holmes* and require a different result. *Holmes* at 1232. The difference is that the government in *Holmes* was acting in its sovereign capacity to collect a tax debt against the sole shareholder of a defunct corporation on the basis of a state law that permitted debt collections against shareholder distributees of dissolved corporations. *Id.* Here, the government cannot act on the contract claim *unless* it acts in the capacity of a third-party beneficiary as opposed to a sovereign.

[23] This claim is asserted as the third cause of action in the Amended Complaint. (Dkt. No. 77.)

against this claim, but the court finds that two of them are both simple and dispositive.[24]  First, pursuant to 26 U.S.C. § 2204(c), a special lien agreement that meets all of the requirements of section 6324A "shall be treated as the furnishing of bond." Following that, section 6325(a) provides that the IRS "shall issue a certificate of release of any lien imposed" within 30 days of being timely furnished an acceptable bond for the assessed tax. 26 U.S.C. § 6325. The court determined in section 3, *supra*, that defendants furnished a special lien agreement that met all of the requirements of section 6324A and that the IRS was required to accept, and it is thus a bond under section 2204(c). As a result, the government's various tax liens under section 6321 were required to be released within 30 days of being furnished, and there is no section 6321 general lien remaining upon which the government can foreclose.

Second, although the government subsequently filed a Notice of Tax Lien in 2005 and a corrected notice in 2007, presumably because the Estate defaulted on its section 6166 payments, the government released these liens in both 2007 and in 2012, including after filing its lawsuit in this matter. While it is true that 26 U.S.C. § 6325(f)(2) authorizes the IRS to revoke lien releases—whether released mistakenly or not—the Revocations filed by the government were not effective. The 2007 Revocation was ineffective because it is undisputed that the government failed to file it in the Salt Lake County recorder's office as required by statute. 26 U.S.C. § 6325(f)(2)(B). The 2012 Revocation was ineffective because by the time the government properly refiled it in the Salt Lake county recorder's office on May 20, 2015, the asset it sought to attach—the Distribution Agreement—was no longer a "right to property" held by the taxpayer Estate because the statute of limitations allowing it to be enforced against defendants had

---

[24] As a result of finding that the following two points are dispositive on this issue, the court declines to address the parties' remaining arguments.

expired.[25] The "property" or "right to property" to which a lien can attach is defined by state law. In *Gardner v. U.S.*, 34 F.3d 985 (10th Cir. 1994), the Tenth Circuit stated:

> Additionally, although federal law delineates the standard for determining when a federal tax lien attaches, [t]he threshold question in this case, as in all cases where the Federal Government asserts its tax lien, *is whether and to what extent the taxpayer had "property" or "rights to property" to which the tax lien could attach*. In answering that question, both federal and state courts must look to state law, for it has long been the rule that in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property . . . sought to be reached by the statute.

(internal punctuation omitted) (emphasis added). The Tenth Circuit also observed "[i]t has been aptly noted that the Government's rights can rise no higher than those of the taxpayer to whom the property belongs. . . Moreover, the tax collector not only steps into the taxpayer's shoes but must go barefoot if the shoes wear out." *Id.* (internal punctuation omitted), *citing* 4 B. Bittker, *Federal Taxation of Income, Estates, and Gifts* paragraph 111.5.4, at 111-102 (1981); and *U.S. v. Rodgers*, 461 U.S. 677, 690-91 (1983). Here, because the taxpayer Estate's rights to enforce the Distribution Agreement had been long expired by 2015, the government is barefoot with respect to its section 6321 tax lien. There is nothing to which its 2015 Revocation or its newly filed 2015 Notice of Tax Lien could attach. Because the taxpayer Estate no longer has "property" or "rights to property" to which its lien could attach in 2015, the government's action to foreclose the lien against the Distribution Agreement must fail.[26]

---

[25] This conclusion also assumes that the government's failure to name the Estate as a party is not in itself fatal to its claim here.

[26] 26 U.S.C. § 6322 provides that the government's section 6321 tax lien arises at the time the taxes are assessed and continues "until the liability for the amount so assessed . . . is satisfied or becomes unenforceable by reason of lapse of time." Contrary to the government's position, the court finds that the language "or becomes unenforceable by reason of lapse of time" must have some meaning that precludes its ability to extend the lien indefinitely, in this case, at least 20 to 24 years from the date of assessment. The government had ample time during that period to protect its rights and failed to do so.

## CONCLUSION

For all of the foregoing reasons, the court GRANTS defendants' Motion to Reconsider (Dkt. No. 119), VACATES its previous grant of summary judgment on the government's Motion for Summary Judgment (Dkt. No. 87) and GRANTS summary judgment on defendants' Motion for Partial Summary Judgment (Dkt. No. 86) finding that the trustees of the Trust are not liable for the unpaid federal estate tax and interest under section 6324(a)(2) because Trust assets are included in the gross estate under section 2033.

In addition, the court GRANTS defendants' Motion for Summary Judgment (Dkt. No. 122) and finds that the trustees of the Trust were discharged from personal liability for the unpaid federal estate tax under section 2004 because they properly furnished a special lien under section 6324A.

The court previously granted in part the United States' Second Motion for Summary Judgment (Dkt. No. 117) on the Amended Complaint's first claim for relief that defendants are liable, pursuant to 26 U.S.C. § 6324(a)(2), for the unpaid estate tax liabilities to the extent of the proceeds they received as beneficiaries of Decedent's life insurance policies. The court now clarifies that because this decision dismisses defendants Barnwell and Devine from this action, the government's recovery is limited to life insurance proceeds received by defendants Smith and Johnson. The government should file a motion requesting judgment in the appropriate amount on this claim.

Finally, as to the remainder of the government's Second Motion for Summary Judgment (Dkt. No. 117), the court DENIES the remainder of the government's first claim for relief in the Amended Complaint for trustee or transferee liability under Section 6324(a)(2); finds MOOT the government's second claim for relief for fiduciary liability under 31 U.S.C. § 3713; DENIES the

government's third claim for relief for foreclosure of federal tax lien against rights created by the Distribution Agreement; and DENIES the government's fourth claim for relief for breach of contract as a third party beneficiary to the Distribution Agreement. The Clerk of Court is directed to dismiss defendants Barnwell and Devine from this action and enter Judgment as above, with the exception of the court's partial grant of relief on plaintiff's first cause of action, which remains to be resolved by the court.

SO ORDERED this 1st day of December, 2016.

BY THE COURT:

_____

Clark Waddoups
United States District Judge